**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0615n.06

**No. 09-4492**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Aug 24, 2011*

LEONARD GREEN, Clerk

| | |
|---|---|
| S. JAMES ZAFIRAU, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE |
| | ) UNITED STATES DISTRICT |
| CLEVELAND MUNICIPAL SCHOOL DISTRICT, | ) COURT FOR THE NORTHERN |
| | ) DISTRICT OF OHIO |
| | ) |
| Defendant-Appellee. | ) |
| | ) |
| LIVESTEEN CARTER, Individually and in her former capacity as Chief Academic Officer, | ) |
| | ) |
| Defendant-Appellee. | ) |
| | ) |
| LISA RUDA, Individually and in her capacity as Chief Legal Counsel, | ) |
| | ) |
| Defendant-Appellee. | ) |

**Before:** **KEITH, GIBBONS, and WHITE, Circuit Judges.**

**PER CURIAM.** Plaintiff-Appellant S. James Zafirau, a public employee with the Cleveland

School District, appeals the grant of summary judgment to Defendant-Appellee Cleveland Municipal

School District in his action for breach of contract. The district court, on a motion for summary

judgment, dismissed the claim based upon Zafirau's failure to exhaust his administrative remedies

prior to bringing this suit. For the reasons that follow, we AFFIRM the district court's ruling.

**BACKGROUND**

Zafirau's breach of contract claim arises from the desegregation of the Cleveland Public Schools, ordered by Judge Frank Battisti in 1976. The parties to the suit, pursuant to Judge Battisti's order, created a comprehensive plan through settlement conferences, including educational programs and methods to assess compliance. In 1994, the parties reached a settlement agreement, which was approved and converted into an enforceable consent decree. In 1995, and in light of poor financial conditions, Circuit Judge Robert Krupansky, sitting on the district court by designation, ordered the State of Ohio Superintendent of Schools to take control of the Cleveland School District's day-to-day operations. *See* Ohio Rev. Code § 3311.71 (converting a school district placed under state control by a federal court into a "municipal school district"). In March 1998, Chief Judge George White of the United States District Court for the Northern District of Ohio held that the School District had substantially complied with the remedial orders and consent decree and eliminated the effects of segregation to the extent practicable. He therefore granted the School District unitary status, in effect releasing it from state control. Under the provisions of § 3311.71, when a school district is released from state control, a new board of education is appointed by the mayor to take control. Accordingly, "the treasurer, business manager, superintendent, assistant superintendents, *and other administrators of the school district* shall submit their resignations to the board." Ohio Rev. Code § 3311.72(A) (emphasis added). Following the resignations, the appointed Chief Executive Officer ("CEO") appoints any administrators he or she determines to be necessary to serve "at the pleasure" of the CEO. Ohio Rev. Code § 3311.72(C)-(D). In this instance, Louis Erste was appointed interim CEO when the state relinquished control of the Cleveland Schools on September 9, 1998.

Dr. S. James Zafirau obtained his Ph.D. in psychology from Notre Dame in 1975. In 1980, he became employed by the Board of Education of the Cleveland City School District. He was originally employed as a "Consultant Teacher." His title changed in or around 1983 to "Supervisor" in the "Policy Planning and Analysis Section." In May 1983, he entered into a "teacher's continuing contract" with the School District. Pursuant to his contract, Zafirau would be "employed in the public schools of the [School District] until, in accordance with law, [he] resigns, elects to retire, is retired, or until, as provided by law, this contract is amended, terminated or suspended." He further agreed to complete those duties and obligations, including teaching, required under the agreement reached between the School District and the Cleveland Teachers Union (CTU), irrespective of the "unusual nature" of his assignment. The contract recognized him as a "certificated employee working a classified position."

In early September 1998, a number of Zafirau's colleagues working in the District's administrative building began receiving letters from CEO Erste informing them that their resignations were required by law, and on September 9, 1998, they would be offered "at-will" employment contracts along with "other employees whose resignations [were] mandated by statute." The letter also stated that if one did not submit a letter for resignation by the deadline, the Board would deem that the resignation had been submitted anyway.

Zafirau did not receive a letter like his colleagues, but he was unsure whether this was purposeful or an oversight. Accordingly, he conducted his own legal research on the definition of his employment to determine whether he was an "other administrator" required to tender his resignation. Upon reviewing the sections, he determined that he was not an "other administrator"

3

because he was not a "supervisor" or "management level employee" as defined by Ohio Revised Code §§ 4117.01(F) and (L). Rather, he considered himself a "professional employee" as defined in Ohio Revised Code § 4117.01(J). Zafirau wrote a letter to the Board of Education setting forth his understanding of the statutory language on September 8, 1998. On September 10, 1998, he executed his at-will employment contract. Zafirau added an addendum to his contract, which stated in relevant part:

> I thoughtfully and respectfully submit that I do not believe that I am required to submit a resignation or an 'At Will Employment Contract' . . . (as detailed in my prior September 8, 1998 dated letter, also attached hereto). I submit the above conditioned signature to this 'contract' subject to the following two understandings: (1) Said signature is valid only if I am required to submit the same under a definitive and clear legal determination that H.B. 269 . . . requires that a person with my restricted authority and functioning (i.e., no fiscal, personnel, or policy making authority, only intellectual contribution responsibilities — with no certificate required) submit a resignation, and (2) That I hereby forward my conditioned/provisional signature only under extreme duress not of my making and only under clear written threat of termination and/or of at least being taken off of the payroll. Furthermore, in no case is this signature to be construed as a resignation from my tenured/continuing contract status within the school district. I have earned and still hold tenure/continuing contract status in the Cleveland City/Municipal School District, and under no circumstances do I give up my tenure/continuing contract rights as either a teacher . . . or those I have similarly earned and hold as a classified/civil service employee.

No one at the Board responded to Zafirau's September 8 letter or his addendum to the executed at-will employment contract. Erste, as CEO of the Board, executed all contracts, including Zafirau's, prior to circulating them to employees.

Zafirau continued working for the School District in the same capacity he had before executing the at-will contract.[1] On October 2, 1998, Zafirau was called into a meeting with his boss, Dr. James Lanese, where they were both discharged by Chief Academic Officer Dr. Livesteen Carter. Carter gave the two men letters from Erste. Zafirau's letter stated that his at-will administrative contract was terminated upon the recommendation of Carter, that he would be immediately escorted from the building upon gathering his personal belongings, and that he would not be permitted to return. Zafirau brought up the fact that he had a continuing teaching contract and asked Carter where he should report for work on Monday. Carter responded she was not at liberty to discuss this matter with him. Security guards thereafter escorted him from the building.

On October 5, 1998, Zafirau contacted the human resources department to inquire about open teaching positions in the School District. They would not inform him of any open positions. He then contacted the Continuing Teachers Union ("CTU"), who did give him a list of schools with positions. Zafirau inquired about an open teaching position at Lincoln-West High School; the school principal said he could fill it.

On October 13, 1998, Zafirau wrote a handwritten letter to the Civil Service Commission formally complaining of his discharge, asserting his status as a classified civil servant, and contesting his "at-will" employment because he was not an administrative employee. According to Zafirau, the Commission never followed up on his complaint or filed a grievance on his behalf.

---

[1]During this period, several statements were made which caused Zafirau, 58, to later believe he was discharged because of his age. However, because the age discrimination claim was not raised on appeal to this court, these facts are not set forth in detail here.

During this same time period, a security guard allegedly witnessed Zafirau repeatedly peering into the window of the administrative building towards Chief Legal Counsel Lisa Ruda's office, and walking around the building at night. Zafirau concedes that he continued going to the Cleveland Public Library across from the administrative building every day to "maintain" his pattern, but denies that he ever peered into Ruda's window or exhibited any other strange behavior to justify a psychological examination.

On October 21, 1998, Russell Gifford, the Chief Operating Officer of the District, wrote a letter to Zafirau indicating that he had been recommended for a job at Lincoln-West teaching mathematics. The letter requested that he respond no later than October 26, 1998, with his intention to accept or decline the position. Zafirau indicates that he did not receive the letter, as the letter was sent to the wrong address. Nevertheless, on October 29, 1998, Zafirau wrote a letter to Gifford, indicating that he received the offer letter on the 29th and that he accepted the teaching position. On October 30, 1998, Gifford wrote another letter to Zafirau, again offering the position, only this time the letter contained the following additional condition:

> This teaching position is contingent on your passing a medical examination which has been scheduled for 1:00 p.m. on November 1, 1998, at the MetroHealth Medical Center on 2500 MetroHealth Drive. We are concerned for the health, safety and welfare of our students in light of the behavior that we have observed since the District terminated your administrative employment contract on October 2, 1998. In particular, the District has observed you loitering around the administration building during late evening hours. We have also observed you peering into office windows during your visits.

The letter requested his acceptance by November 4, 1998. The letter was postmarked November 2, 1998; Zafirau did not receive it until November 6, 1998.

The other eight employees whose at-will contracts were terminated but who still held continuing teacher's contracts were offered classroom teaching positions, and none were conditioned on the successful completion of fitness for duty examinations. Zafirau, through his attorney, negotiated the details of the psychological exam but never actually completed it. Correspondence concerning the medical examination ended in February 1999, around the same time that Zafirau's attorney stopped representing him due to Zafirau's inability to pay fees.

Zafirau never completed the examination, and the School District never placed Zafirau in a teaching position. Nevertheless, the School District asserts that it did not terminate Zafirau's employment. From October 1998 until January 1999, Zafirau was not paid. The CTU filed a separate grievance on behalf of a group of teachers laid off for a period during the restructuring concerning non-payment during that period. Zafirau was included in this class action even though his teaching position was somewhat unique. The CTU reached a settlement on behalf of Zafirau and others on September 20, 1999. The "Stipulated Award" was entered by an arbitrator and provided that, within 45 days of that date, all grievants would be "placed on and receive compensation per the Teacher's Salary Schedule based on years of completed Cleveland Municipal School district service (administrative and teaching) and/or continuing contract status." Thereafter, Zafirau received a check on October 29, 1999, for his total net unpaid compensation from October 2, 1998 to December 31, 1998.

Zafirau received bi-weekly checks from the School District beginning in January 1999 and continuing until October 29, 1999. He received an additional payment in November 1999 for an adjustment in salary corresponding to his previous payments. He received a final "supplemental

pay" check on December 24, 1999. Zafirau has not been paid since, nor has he received any notification as to why the payments stopped. In November 1999, Zafirau contacted the School District's payroll department about his missing checks. He was informed that the checks had been confiscated by Ruda. He has not received a W-2 form from the School District since 1998. The School District asserts that he has not been terminated; rather his pay has been suspended until his psychological examination is completed. Zafirau contends that he never received notification of such action, nor has he been notified again about a psychological examination. Zafirau alleges that, after his compensation ended, he "went to the CTU to inquire and complain about the fact and was told, basically, that they would not file any more grievances for [him]." Zafirau has subsequently obtained work in the Toledo Public Schools as a guidance counselor.

Zafirau filed an original complaint against the School District in the Court of Common Pleas of Cuyahoga County on October 2, 2000. The case was subsequently dismissed without prejudice because a settlement had been reached. However, Zafirau filed a motion for relief asserting that a settlement had not been reached in November 2002. Zafirau then dismissed his own motion and refiled the case anew on December 20, 2002. The School District opted to remove the case to the United States District Court for the Northern District of Ohio. In Zafirau's amended complaint before the district court, he asserted the following claims against the School District: (1) that it violated his due process rights by denying him his constitutionally protected property interest in his classified position and his continuing contract with the District; (2) that it discriminated against him on the basis of his age (including a claim against Carter specifically), in violation of the Age Discrimination in Employment Act (ADEA); (3) that it discriminated against him based upon his

hearing handicap; (4) that it unlawfully retaliated against him for asserting disability claims; and (5) that the District "breached the continuing contract by failing to put [him] in a teaching position after he was discharged on October 2, 1998 from the classified position." Additionally, Zafirau asserted a state-law invasion of privacy claim against Ruda individually.

On May 2, 2003, the School District, along with Ruda and Carter, moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure Rule 12(b)(6). The district court granted in part the motion, dismissing the due process and invasion of privacy claims on December 10, 2003. On May 6, 2004, the School District filed a motion for summary judgment as to all remaining claims. The district court referred the case to a magistrate judge, who prepared a report on August 27, 2004, recommending that the district court grant the School District summary judgment as to the discrimination claims but deny the motion as to the breach of contract claim and retain jurisdiction over the matter. Each party filed objections, and, on March 31, 2005, the district court granted the School District's summary judgment motion as to the retaliation claim, disability claim, and dismissed the breach of contract claim for lack of subject matter jurisdiction because Zafirau failed to exhaust his administrative remedies. The district court denied the motion for summary judgment as to the age discrimination claim based upon the School District's failure to provide a proper witness for examination. However, upon further review and subsequent discovery, the district court granted the School District's motion for summary judgment as to the age discrimination claim on October 28, 2009. Zafirau timely appealed to this court, arguing that the district court erred in dismissing his breach of contract claim for lack of subject matter jurisdiction.

## ANALYSIS

We review a district court's decision regarding subject matter jurisdiction de novo. *Grand Trunk W. R.R. Inc. v. Bhd. of Maint. of Way Emps. Div.*, 497 F.3d 568, 571 (6th Cir. 2007). Whether the court has subject matter jurisdiction is an issue that may be raised at any time, as it goes to the power of the court to adjudicate the merits of the case. *United States v. Cotton*, 535 U.S. 625, 630 (2002). Here, the district court raised the issue while considering the School District's motion for summary judgment. While the district court had supplemental jurisdiction to consider the breach of contract claim pursuant to 28 U.S.C. § 1331, it abstained from reaching the merits of the claim because Zafirau failed to exhaust his administrative remedies prior to filing this suit.

When a public employee and an employer have entered into a collective bargaining agreement and a dispute arises, Ohio Revised Code § 4117 controls. *State ex rel. Ramsdell v. Washington Local Sch. Bd.*, 556 N.E.2d 197, 200 (Ohio Ct. App. 1988). If a party's claims "arise from or depend on the collective bargaining rights created by [Ohio Revised Code] Chapter 4117, the remedies provided in that chapter are exclusive." *Franklin Cnty. Law Enforcement Ass'n v. Fraternal Order of Police*, 572 N.E.2d 87, 91 (Ohio 1991). Chapter 4117 "provides that if a collective bargaining agreement provides for a final and binding arbitration of grievances, public employers, employees, and employee organizations are subject solely to that grievance procedure." *Blair v. Milford Exempted Vill. Sch. Dist. Bd. of Educ.*, 575 N.E.2d 1190, 1197 (Ohio Ct. App. 1989).

If an appellant believes a grievance was not properly pursued by the State Commissioners or the Union, that complaint is essentially an allegation of an unfair labor practice pursuant to Ohio

10

Revised Code § 4117.11(B). *Shamrock v. Trumbull Cnty. Comm'rs*, 593 N.E.2d 28, 31 (Ohio Ct.

App. 1990). Under § 4117.11(B) (2010),

> [i]t is an unfair labor practice for an employee organization, its agents, or representatives, or public employees to: (1) Restrain or coerce employees in the exercise of their rights guaranteed in Chapter 4117 . . . ; [or] (3) Refuse to bargain collectively with a public employer if the employee organization is recognized as the exclusive representative or certified as the exclusive representative of public employees in a bargaining unit; . . . [or] (6) Fail to fairly represent all public employees in a bargaining unit[.]

Additionally, as acts which constitute unfair labor practices under § 4117 are subject to the exclusive

jurisdiction of the State Employment Relations Board ("SERB"), the courts cannot review such

claims on primary jurisdiction. *Shamrock*, 593 N.E.2d at 30-31; *Franklin Cnty. Law Enforcement*

*Ass'n*, 572 N.E.2d at 90. SERB, not the courts, resolve unfair labor practice charges in two general

areas: "(1) where one of the parties filed charges with SERB alleging an unfair labor practice under

R.C. § 4117.11 and (2) where a complaint brought before the common pleas court alleges conduct

that constitutes an unfair labor practice specifically enumerated in R.C. § 4117.11." *State ex rel.*

*Ohio Dep't of Mental Health v. Nadel*, 786 N.E.2d 49, 54 (Ohio 2003). An appellant may only seek

relief from the courts after he or she has exhausted the administrative remedy provided through

SERB. *Shamrock*, 593 N.E.2d at 31.

Here, Zafirau agreed in his continuing teaching contract to representation by the CTU.

Additionally, he submitted himself to the representation of the CTU when he agreed to the Stipulated

Award bargained for by the CTU on behalf of aggrieved teachers laid off during the transition period

from state to municipal authority in 1998, despite his unique employment situation. Accordingly,

the collective bargaining agreement ("Agreement") between the School District and the CTU controls Zafirau's claim.

The Agreement, effective from September 1, 1996 through August 31, 1999 (during which period Zafirau alleges injury due to his being terminated in October 1998 in violation of his continuing teacher's contract), defines a grievance as "any matter concerning the interpretation, application, or alleged violation of any currently effective Agreement between the District and the CTU, or which alleges any employee represented by the Union has been discharged or disciplined without just cause, or has been treated unfairly or in a discriminatory manner." The Agreement further states that "[n]othing shall preclude the Union or an individual from the right to file an Unfair Labor Practice in accordance with Ohio Revised Code 4117."

All of Zafirau's alleged injuries on appeal arise in relation to his rights guaranteed by his contract and are dependent upon the Agreement he entered upon accepting the position with the School District. The Agreement guaranteed him employment. Accordingly, Zafirau alleges that the School District's requirement that he subject himself to a psychological examination before working violates this Agreement.

On appeal to this court, Zafirau does not dispute that he has not exhausted his contractual remedies in failing to file a grievance with SERB. Rather, he argues that any attempt to file a grievance with the CTU and follow the grievance procedure would be futile, as both the CTU and the Commissioners already expressed disinterest or even hostility towards his previous attempts to bring a grievance forward. However, the issue of futility does not pertain to Zafirau's relief through SERB. He has not sought relief from the union's alleged unfair labor practice, nor has he even

pursued a grievance concerning the School District's requirement that he submit to a psychological examination in order to work as a teacher pursuant to his Stipulated Award. This court cannot speculate on the result of such proper complaints. Accordingly, futility cannot avoid the requirement that Zafirau must first exhaust his contractual remedies before seeking relief in court. *See Fasone v. Clinton Twp.*, No. 97APE06-845, 1997 WL 710584, at *2 (Ohio Ct. App. 1997) ("[E]ven if appellant's efforts during the grievance procedure were arguably in vain, the proper course of action was still to file a charge with SERB. Hence, the failure-to-exhaust rule and its accompanying exception do not even apply here."); *Shamrock*, 593 N.E.2d at 31 ("[I]f appellants believe that the grievance was wrongfully withdrawn and the Commissioners wrongfully refused to arbitrate, then appellants must pursue the alleged unfair labor practices through SERB pursuant to R.C. Chapter 4117, prior to appealing to this court.").

Zafirau attempts to avoid the issue of exhaustion of administrative remedies by reframing the issue on appeal as whether the district court has jurisdiction to enforce the arbitration award negotiated by the CTU on his behalf, in that the Stipulated Award indicated that he would be employed within forty-five days and did not explicitly require a psychological examination as a prerequisite to his employment. This argument is not only waived because Zafirau failed to raise it below, but is unpersuasive. *See Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006) ("It is well-settled that this court's function is to review the case presented to the district court, rather than a better case fashioned after an unfavorable order." (internal punctuation and citation omitted)). The Stipulated Award guaranteed that Zafirau would be employed by the School District. The School District did attempt to employ Zafirau in the appropriate time frame subject to the additional

requirement that he complete the psychological examination. The terms of Zafirau's employment were guaranteed by the Agreement. That the School District required the psychological examination, however, arguably amounted to an unfair labor practice on the part of the School District against Zafirau by interfering with his ability to teach. *See* Ohio Rev. Code § 4117.11(A)(1) ("It is an unfair labor practice for a public employer, its agents, or representatives to: (1) interfere with, restrain, or coerce employees in the exercise of the rights guaranteed under Chapter 4117."). Such a practice should be grieved by Zafirau to, or through, the CTU or directly to SERB prior to filing suit in court. Accordingly, as Zafirau's claim stemmed from a grievance originating from his rights guaranteed by the Agreement, any attempt to consider this as a matter of arbitration enforcement disguises the underlying issue.

Finally, because we do not reach the merits of Zafirau's breach of contract claim, we need not address the issue of whether Zafirau appealed from his continuing teacher's contract alone, or if he additionally appealed from breach of his classified status as well. We have previously held that "if a court does not have jurisdiction, *ipso facto*, it cannot address the merits of a case." *Charter Twp. of Muskegon v. City of Muskegon*, 303 F.3d 755, 764 (6th Cir. 2002) (quoting *Rogers v. Stratton Indus. Inc.*, 798 F.2d 913, 917 (6th Cir. 1986)). Accordingly, we abstain from reaching the merits of this claim as well.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of Zafirau's breach of contract claim because he failed to exhaust his administrative remedies prior to filing his claims in the lower court.